**BALLY/MIDWAY MFG. CO., Appellant,**

v.

**U.S. INTERNATIONAL TRADE COMMISSION, Appellee.**

**Appeal No. 82–32.**

United States Court of Appeals, Federal Circuit.

Aug. 2, 1983.

---

1. Note that the original claims had been rejected under § 102 (as well as § 112). *See supra.*

Paul Plaia, Jr., Washington, D.C., argued for appellant. With him on brief were Cecilia H. Gonzalez, Washington, D.C., Donald L. Welsh and Sidney Katz, Chicago, Ill.

Joel R. Junker, Washington, D.C., argued for appellee. With him on brief was Michael H. Stein, Washington, D.C.

George H. Gerstman, Chicago, Ill., was on brief for The Amusement Game Manufacturer's Ass'n, amicus curiae.

Before FRIEDMAN, NICHOLS, and BENNETT, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal from a determination of the U.S. International Trade Commission ("the Commission") that the importation of copies of a particular video game that infringed the appellant's copyright and trademark covering the game did not violate section 337(a) of the Tariff Act of 1930, 19 U.S.C. § 1337(a) (1976). The ground of the Commission's decision was that the practice involved—the importation of the infringing games—did not, as the statute requires, have an "effect or tendency" to "destroy or substantially injure an industry . . . in the United States." We reverse.

I.

A. This case grows out of an attempt by the appellant to exclude from the United States foreign-made copies of video games it manufactures and sells in the United States. Video games are a relatively new, but widespread phenomenon in this country. The popularity of the games has resulted in a number of companies which devote substantial resources to the development, production, and sales of this product.

The games generally consist of cabinetry containing electronic circuitry and a television picture tube which serves as a screen on which the visual images of the game are shown. The major component of each game is a printed circuit board which houses the electronic circuitry that generates the images and sounds of the game; the circuit board can be sold separately from the rest of the game.

Unlike most other products, a particular video game generally has only a brief period of popularity, accompanied by high production and sales. As new video games enter the market, the old games decline in popularity, and production and sales decrease. This pattern of production and sales is reinforced by the fact that there are only a limited number of sites for video games (i.e., in arcades), and most arcades will purchase only a few of each game. Thus, there is continual pressure on video game manufacturers to develop new games, and sell as many of each game as possible during its short life-span.

The two games involved in this case, Pac-Man and Rally-X, were developed by Namco Limited of Japan in 1980. In the same year, Namco assigned all of its United States rights to the games, including all related copyrights and trademarks, exclusively to Bally, in return for advance payments and royalties. Specifically, Namco authorized Bally to produce, distribute, and service Rally-X and Pac-Man in the United States.

B. 1. On April 17, 1981, Bally filed with the Commission a complaint alleging that 35 companies violated section 337(a) by importing video games that infringe Bally's copyrights and common law trademarks on Rally-X and Pac-Man.

The Commission initiated an investigation in the case on July 1, 1981, and subsequently named 50 respondents. The Commission found that most of the respondents (both foreign and domestic) were in default for failure to respond to the complaint, participate in discovery, or appear in the Commission proceedings. Only a few of the respondents participated in the proceedings at all, and only one of them appeared at the hearing.

A lengthy hearing was held before an administrative law judge, in which substantial testimony was taken and numerous exhibits and depositions were admitted into evidence. The administrative law judge issued a recommended decision in which he concluded that the importation of Pac-Man, but not the importation of Rally-X, had violated section 337(a). After additional hearings, the Commission adopted these recommendations. *See In re Certain Coin-Operated Audiovisual Games and Components Thereof,* U.S. Int'l Trade Comm'n Publ. No. 1267 (July 1982).

2. The Commission found that Bally's copyrights on "audiovisual works" in the Pac-Man and Rally-X games (*i.e.,* the mazes, characters, and other graphic works appearing on the screen in the games and the accompanying sound effects) were valid, and were infringed by respondents' video games that copied these audiovisual works. The Commission also found that Bally had common-law trademark rights to the names "Pac-Man" and "Rally-X," and that these rights were infringed by the use of similar names on the respondents' games.

The Commission accepted the administrative law judge's "traditional definition" of the domestic industry as "that portion of complainant's business devoted to the exploitation of the intellectual property rights in issue," and agreed with his application of this definition "only to those facilities making and selling *games* under the PAC–MAN and Rally-X copyrights and trademarks." (Emphasis in original.)

The Commission found that under this standard "there is an industry currently involved in the production, distribution and sale" of the Pac-Man game, and that the industry was efficiently operated. The "Pac-Man industry has enjoyed considerable success . . ." and "it is expected that Pac-Man's market life will continue, at least through the end of 1982, and possibly longer."

The Commission then found that the "unfair acts alleged have the effect or tendency of substantially injuring the domestic Pac-Man industry." It stated that Bally "has lost . . . [a number of] PacMan sales" to infringing imports sold in the United States, which were virtually identical to the Pac-Man game. It also indicated that the substantial percentage by which the prices of the infringing imports are lower than Bally's prices for Pac-Man "is strong evidence of a tendency to substantially injure the domestic industry."

The Commission concluded that the importation of video games that infringed Bally's trademark and copyright on Pac-Man violated section 337(a). The Commission entered an order under section 337(d) excluding from entry into the United States "[c]oin-operated audiovisual games and components thereof which infringe complainant's Pac-Man copyrights and/or trademark" except where "such importation is licensed by the copyright and/or trademark owner."

3. With respect to Rally-X, the Commission concluded that no domestic industry existed. It stated that Bally's inventory of Rally-X games is low, that "[c]urrently, there are no facilities being used to produce an article competitive with the imported Rally-X games[,]" and that the "[c]omplainant is no longer actively engaged in distribution or sale of Rally-X games." Based on the administrative law judge's findings, the Commission concluded that "the popularity of the Rally-X game is in a state of permanent decline[,]" and that "[t]here is nothing in the record to indicate that complainant will resume the manufacture and marketing of the games even if the Commission were to find a violation of section 337 and issue a general exclusion order . . . ."

The Commission also agreed with the administrative law judge that if a Rally-X industry did exist, it was "efficiently and economically operated."

The Commission also found that, if a Rally-X industry existed, it was not injured by the infringing imports. The Commission stated that "[t]here is no evidence in the record that the decline in sales of Rally-X games is due to import competition, or that, in absence of import competition, domestic production of the Rally-X game would have continued." The Commission agreed with the finding of the administrative law judge that "the popularity of the Rally-X game is in a state of permanent decline which is characteristic of such games."

## II.

Section 337(a) makes unlawful

[u]nfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale ..., the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry ....

■ As noted, the Commission defined the domestic "industry" in this case as the facilities of Bally that produced and sold the Rally-X game. The parties generally do not question that definition, and we accept it as the basis for deciding this case.

Although the Commission discussed the case in terms of the status and effect of the importations upon the Rally-X "industry," as the statute requires, a more realistic analysis must recognize that the actual focus of the inquiry was upon a particular and relatively narrow segment of Bally's business, namely, the production of Rally-X games. The correctness of the Commission's two critical rulings in this case—that there was no domestic Rally-X industry and that, if there were one, it had not been injured by the importation of the infringing video games—must be determined in the light of the actual business operations that the Commission was endeavoring to protect

from unfair competition in applying section 337.

■ A. 1. The Commission based its determination that there was no Rally-X industry on the market conditions that existed when it decided the case. We conclude, however, that in the circumstances of this case the proper date for determining whether Bally's Rally-X game constituted an "industry" entitled to protection under section 337 was the date on which the complaint was filed rather than the date on which the Commission rendered its decision.

a. Section 337(a) prohibits unfair practices "the effect or tendency of which is to destroy or substantially injure" a domestic industry. Under the Commission's theory, if there is an existing industry when the complaint is filed, but it is destroyed by the unfair practices during the Commission proceedings, there has been no violation of section 337(a). The effect of the Commission's position, if adopted, would be to vitiate the statutory proscription of unfair practices "the effect ... of which is to destroy ..." a domestic industry.

The Commission's interpretation of section 337(a) also produces anomalous results. If the effect of the unfair practices has been to injure seriously the affected business during the administrative proceeding— for example, if the infringing imports captured half of the complainant's business— the importation would violate section 337(a). If, however, the infringers were so effective that they succeeded in capturing all of complainant's business and therefore destroyed the relevant "industry," then there would be no violation under the Commission's theory. The result would be that the infringing importers whose unfair practices were most effective, i.e., those who succeeded in destroying their American competition, would be treated more favorably than those whose unfair practices were less successful. It is most unlikely that Congress, which enacted section 337 to "prevent every type and form of unfair practice" and to provide "a more adequate protection to American industry than any anti-dumping statute the country has ever

had[,]" intended the statute to have such a bizarre effect. Sen. Comm. on Finance, S.Rep. No. 595, 67th Cong., 2d Sess. 3 (1922) (accompanying Tariff Act of 1922).

The anomaly of the Commission's interpretation of the statute is especially disturbing in the case of the video game business. As indicated, the nature of the product and its distribution mean that most individual games have extremely limited lives, and that even the most successful games are on the market for a relatively brief time. In many instances, it seems likely that infringing imports will destroy or virtually eliminate the market for a particular domestically manufactured game before the Commission could complete its administrative proceedings.

In this very case, for example, the unfair practices directed against Rally-X were identical to those directed against Pac-Man. The reason the Commission protected Pac-Man from further injury by an exclusion order was that the Pac-Man infringing imports had not been as successful in injuring Bally's Pac-Man business as the infringing Rally-X games had been in injuring Bally's Rally-X game. Bally's Rally-X game, however, is just as entitled to protection under the statute as the more successful and apparently economically stronger Pac-Man game.

There is additional support for our conclusion in the statute itself. Section 337(a) prohibits not only unfair practices, the effect or tendency of which is to destroy or substantially injure a domestic industry, but also those that do or may "prevent the establishment of such an industry . . . ." Since Congress barred unfair practices that prevent the establishment of a domestic industry, it is hard to believe that it did not also intend to prohibit unfair practices that were so effective that they destroyed an existing industry before an administrative proceeding under section 337 could be completed. Indeed, one would think that Congress would be more concerned with protecting an existing business from rapid destruction by imports than with protecting a business that had not yet come into exist-

ence. Under the Commission's theory, however, the non-existent business would receive greater protection than the existing one destroyed by import competition during the pendency of the case.

In sum, if there was an existing domestic Rally-X "video game industry" when the complaint was filed, section 337(a) was satisfied.

■ b. In its brief, the Commission argues that the remedies it may provide under section 337, namely, exclusion and cease and desist orders, are "prospective in nature, applying only to future conduct or activities[,]" and that "[t]he statute does not provide for recovery for past damages suffered." The Commission apparently contends that because it probably would not have entered a remedial order against the infringing Rally-X games even if it found a violation, that fact precluded a finding of violation.

The Commission's conclusion does not follow from its premises, however. The statutory scheme bifurcates the violation and remedy phases of a case. Section 337(c) first directs the Commission to determine "whether or not there is a violation . . . ." If the Commission determines that "there is [a] violation," section 337(d) directs the agency then to consider the question of remedy to deal with the violation found.

In making the remedy determination, section 337(d) requires the Commission to consider "the effect of [the] exclusion [of imports] upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers . . . ." The Commission thus is required to consider a different and broader range of issues in deciding the remedy question than in deciding whether there is a violation. Furthermore, unlike the violation determination, an exclusion or cease and desist order of the Commission is not effective unless and until the President has approved it. 19 U.S.C. § 1337(g).

The Commission itself has recognized that the issues of violation and remedy are separate, and that it should determine the question of violation even though it might not issue any remedy if it finds a violation. In *In re Certain Automatic Crankpin Grinders,* 205 U.S.P.Q. 71 (1979), the Commission first held that the importation into and sale in the United States of foreign products that infringed United States patents violated section 337 because the effect or tendency was to destroy or substantially injure a domestic industry. It then concluded, however, that in the circumstances of the case, "the public interest considerations ... are stronger than complainant's rights to enforcement of its patent monopoly through a remedy pursuant to section 337. Accordingly, we are providing no remedy for the violation of section 337, which we have found to exist." 205 U.S.P.Q. at 80.

In sum, Congress did not intend the Commission to consider questions of remedy when the agency determines whether there is a violation.

■ 2. The record shows that when Bally filed a complaint with the Commission in April 1981, its Rally-X business constituted an existing "industry" under section 337(a).

Bally manufactured and sold a substantial number of Rally-X games during the first half of 1981. (Since the Commission treated production and sales figures as "confidential business information" that it placed under a protective order, and since we authorized the portions of the record containing those data to be submitted *in camera,* we do not state in this opinion the actual figures.) Bally continued this business until late 1981, although "production and sales ... decreased" from March through November of that year. Bally apparently had ceased production and most sales of the game by late 1981, and few games were left in inventory at that time.

Although Bally's Rally-X business was small in comparison with its Pac-Man business, this comparison is misleading in determining whether the Rally-X business was an existing "industry" when the complaint was filed. The administrative law judge

noted that Pac-Man "has demonstrated a viability and popularity in the market that is somewhat exceptional compared to other ... games." Moreover, "[t]here is nothing in the statute which requires that an industry must be of any particular size ...." *In re Von Clemm,* 229 F.2d 441, 444, 43 C.C. P.A. 56, 59, 108 U.S.P.Q. 371, 373 (1955).

Since most individual games in the video game business have only a short life (see *supra,* page 1119), it is immaterial that Rally-X was in this category. If the fact that Rally-X was short-lived was dispositive or even significant in determining the existence of an industry under section 337(a), it would be a rare video game that would be entitled to the protection of that section. There is nothing in the statute that indicates or even suggests that Congress did not intend relatively short-lived American video games to receive the same protection against copyright and trademark infringement by imported competing products that other domestic businesses enjoy.

Bally's Rally-X business thus constituted a domestic industry under section 337(a) at the time the complaint was filed. The deterioration of that business during the Commission proceedings does not undermine that conclusion.

B. The Commission also erred in its alternative ground for dismissing the complaint with respect to Rally-X: that even if there were a Rally-X industry, it had not been injured by the infringing imports.

■ 1. The number of infringing Rally-X games sold in the United States was significant. Several respondents who entered into consent decrees indicated that they either imported and sold infringing games or that they purchased them. Bally's distributors have complained to Bally about a number of other infringing sales, and video game operators have told Bally of "copy games" they have seen in their particular areas. Customs officials testified that infringing Rally-X games have and were (and are still) entering the United States, and that their number "has recently increased."

Since there is no indication that the infringing games were purchased in substitution for some other game rather than in substitution for Bally's Rally-X game, the inference is inescapable that every sale of an infringing Rally-X game resulted in a lost sale of that game by Bally. Indeed, in the case of Pac-Man, the Commission based its finding of injury on the fact that the sales of infringing games represented a loss of sales by Bally. There is no basis to believe that the effect of the infringing °imports of Rally-X on Bally's Rally-X business was any different from the effect of infringing imports on its Pac-Man business.

In discussing the injurious effect of the infringing imports upon Bally's Pac-Man business, the administrative law judge stated that "[i]f all named respondents had participated in discovery, additional lost sales would have been established for the record," and that this conclusion "is buttressed by evidence which indicates that the importation of video games [including Pac-Man and Rally-X] has recently increased." Based on these findings, the Commission drew an inference in favor of Bally that the number of lost Pac-Man sales indicated by the record is "an underestimation" because of "the multiplicity of defaulting respondents and the popularity of the game . . . ." There is no reason why a similar inference should not be drawn in the case of the Rally-X games.

Although the number of infringing imports was not a high percentage of Bally's total sales of the Rally-X game, it was enough to establish injury to a domestic industry under section 337(a). That section prohibits not only unfair acts, the effect of which is to "destroy or substantially injure" a domestic industry, but also such acts that have a "tendency" to do so. The sales of infringing Rally-X games were approximately the same percentage of Bally's total sales of those games as the sales of the infringing Pac-Man games were of Bally's total sales of Pac-Man. The Commission held that the loss of that percentage of Bally's Pac-Man business to the infringing imports established that those imports created a tendency to injure, in violation of

section 337(a). There is no basis for a different conclusion with respect to the comparable sales of the infringing Rally-X games.

■ Where the unfair practice is the importation of products that infringe a domestic industry's copyright, trademark, or patent right, even a relatively small loss of sales may establish, under section 337(a), the requisite injury to the portion of the complainant's business devoted to the exploitation of those intellectual property rights. In discussing the application of section 337 to unfair competition involving patent infringement, Congress stated: "Where unfair methods and acts have resulted in conceivable losses of sales, a tendency to substantially injure such industry has been established." *See* House Comm. on Ways and Means, Trade Reform Act of 1973, H.R.Rep. No. 571, 93d Cong., 1st Sess. 78 (1973). *Accord, Von Clemm,* 229 F.2d at 445, 43 C.C.P.A. at 60, 108 U.S.P.Q. at 374. As the administrative law judge explained with respect to Pac-Man, "[t]he pirating of these games . . . can only have an adverse effect on competition in the development and manufacture of video games [under trademarks and copyrights]. There will be little incentive for video game manufacturers to devote the months or years necessary to develop a new video game if the result of their ingenuity and workmanship can be stolen so easily and the resultant product can be instantaneously undersold by pirated copies."

Accordingly, the sales of Rally-X that Bally lost to the infringing imports established the requisite injury to the Rally-X industry under section 337(a).

Other indicia of injury, which the Commission relied on to show that the domestic Pac-Man industry suffered injury, are also present here. *Cf. Astra-Sjuco, A.B. v. U.S. Int'l Trade Comm'n,* 629 F.2d 682, 690, 67 C.C.P.A. 128, 136, 207 U.S.P.Q. 1, 8 (CCPA 1980) (applying similar criteria of injury). The record shows that foreign importers have sent numerous solicitations to potential United States purchasers of Rally-X

that advertise infringing games, and that these solicitations continued during the hearings. Additionally, the foreign markets for the sale of Rally-X games (particularly Japan) are saturated and, as a consequence, foreign manufacturers of infringing games (mostly Japanese companies) have a large surplus inventory to sell in the United States at low prices and a substantial capacity to produce additional games. The continuing solicitations, coupled with the surplus inventory and capacity to make Rally-X games, strongly suggest that the foreign companies intend to continue sales of infringing imports where they can.

■ 2. The Commission found, however, that the decline in Bally's sales of the Rally-X game resulted not from the infringing imports but from the drop in popularity of the game itself. It concluded from this fact that the unfair practices were not the cause of the injury that Bally suffered during the period of the imports.

As discussed above, the record shows that a significant number of the infringing Rally-X games, which were virtually identical to Bally's game, were imported into and sold in the United States.

The administrative law judge also found that "[p]rice is a major consideration for the purchasers of video games," and that "[t]here is a significant price differential between [the] infringing imported games and complainant's games." He further found that "[t]he locations where video games can be placed are limited," that "when there is an opening at a location, usually only one game can be placed there." Therefore, "[w]hen a sale is lost at a particular location, that sale cannot be subsequently recovered." These findings related to the video game industry generally, not just to Pac-Man.

This evidence demonstrates that Bally's Rally-X games and the infringing imports are virtually identical, that the infringing imports were significantly cheaper than Bally's product, and that the market for Rally-X games necessarily is limited. In these respects, the situation of Rally-X cannot be distinguished from that of Pac-Man.

It was on the basis of virtually identical facts that the Commission concluded that the infringing imports injured the Pac-Man industry. These facts also require a finding of injury to the Rally-X industry.

The evidence the Commission relied on to find that infringing imports were not the cause of injury to the Rally-X industry indicates that Rally-X sales declined in 1981, that Rally-X is a less popular game than Pac-Man and several other games, and that perhaps Bally lost some Rally-X sales because of the presence of these other games. This evidence is not inconsistent with, and therefore does not refute the other evidence in the record showing that the infringing imports injured Bally's Rally-X business, however. Indeed, the Commission accepted this conclusion in the case of Pac-Man, since it found injury to that industry because of lost sales and other instances of injury (described above) even though "the pace of [Bally's] sales [of Pac-Man] had slowed somewhat," which might suggest a lessening of popularity of that game also.

This case, therefore, is not one in which the agency decision was dependent on selecting between two sets of conflicting evidence. Rather, it is one where uncontradicted evidence established injury to Bally's Rally-X business, and other evidence—not in conflict—indicates that other factors resulted in Bally's loss of additional Rally-X sales. The Commission thus cannot defend its decision on the injury issue, as it seeks to do, on the theory that since the evidence on injury was conflicting, the agency acted within its discretion in accepting one rather than the other body of evidence.

## CONCLUSION

The determination of the U.S. International Trade Commission that there has been no injury to the domestic Rally-X industry is reversed. The case is remanded to the Commission for further proceedings on the relief aspect of this case, consistent with this opinion.

REVERSED and REMANDED.

NICHOLS, Circuit Judge, concurring.

I join in Judge Friedman's clear and able opinion, but I would go further.

The record here reflects little short of total breakdown of the laws respecting unfair practices in import trade, *e.g.*, 19 U.S.C. § 1337, at least as applied to video games. Counsel in oral argument also characterized 19 U.S.C. § 1526 as ineffective so far as they were concerned.

It is evident that a breakdown of law enforcement inflicts injury far beyond the immediate victim. If persons are lawlessly gunned down on the public streets, and the state makes no effective response, those far removed from the scene acquire hand guns for personal protection, with all the dangers incident. They stay off all streets at night, and some at any time, to the point they are virtually prisoners in their own homes. The prosperity of legitimate business is destroyed, real estate values tumble, and jobs vanish from the employment market, except perhaps jobs as private guards, which proliferate. Eventually, if things go far enough, all will adhere to some mafia, or other extra-legal government, hoping it will avenge their death, and being, unlike the state, perfectly willing to do so, may even deter that event from happening. These are the reasons why murder is not, as it once was, a merely private wrong, to be avenged by the family of the victim only.

Something parallel, if less dramatic, occurs if the state creates patent and trademark rights and fails to enforce them, though they are important to the state and not to the patent and trademark holder only. If, however, the original producing infringer is outside the United States, the burden of enforcement falls on different shoulders. By § 1337, the ITC is here the chief of police, and the officers of the customs are the patrolmen on the beat, doing what they are told.

The treatment of "injury" to a domestic industry as abated if the domestic industry dies during the course of the ITC proceeding, impresses me as one of the evasions law enforcement officers are prone to when the task appears too formidable. I heartily join in the court's condemnation of it. But, to me, the weird definition of "domestic industry" is likewise an evasion. To me it is obvious there is one industry: all the law-abiding domestic producers of video games. Is there a new industry every time an Italian designer comes out with a new design of women's shoes, or is there a shoe industry? A public and obvious demonstration that the protective laws are ineffectual induces capital to be withdrawn from the industry to some safer use, and prevents new video games from being conceived, manufactured, and marketed in a lawful way. Is this not the injury the Congress enacted § 1337 to prevent? If not, what was it?

It is not, however, my intent to pronounce dicta on the infinite variety of future cases that may come before the court. The congressional purpose is best served by flexibility. It may make a difference in what context "injury" is used which may include dumping and countervailing duty cases. "Injury" may at times be narrowly focused and it would frustrate Congress to look at a broad industry that may remain healthy. In the *Von Clemm* case, cited by the panel, it is made clear the statute therefore does not require the "industry" be of any particular size nor does it specify whether the "industry" is one company or several. Here we have not just one company, but one product of one company singled out as the whole "industry." Obviously the language that defines "injury" as including "or to prevent the establishment of such an industry" is deprived of all meaning if limited to preventing establishment of another "industry" to produce the Rally-X game. We might be safe in assuming that the supposititious founder of a new "industry" always would seek to differentiate his product in some fashion and it seems to me going too far to suppose that by effectuating such a policy he would take himself outside the statute. Such an interpretation makes the statute a disincentive to resourcefulness.